RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0159p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DANIEL LOCKRIDGE,

*Defendant-Appellant*.

No. 24-5784

─────────────

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 1:23-cr-00082-1—Curtis L. Collier, District Judge.

Argued: June 11, 2025

Decided and Filed: June 18, 2025

Before: SUTTON, Chief Judge; CLAY and THAPAR, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ARGUED:** Howard W. Anderson, III, TRULUCK THOMASON LLC, Greenville, South Carolina, for Appellant. Brian Samuelson, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Howard W. Anderson, III, TRULUCK THOMASON LLC, Greenville, South Carolina, for Appellant. Brian Samuelson, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

─────────────

## OPINION

─────────────

SUTTON, Chief Judge. Daniel Lockridge, who stands convicted of a methamphetamine-distribution charge, challenges two conditions of his supervised release, one requiring him to obtain mental-health treatment, the other requiring him to obtain substance-abuse treatment.

He claims that both conditions flout the district court's responsibilities under Article III of the U.S. Constitution because a probation officer oversees them. Seeing no constitutional infirmities, we affirm.

I.

Daniel Lockridge is a decorated combat Marine and a methamphetamine trafficker. After he returned to this country in 2009, he turned to methamphetamine—first to manage his post-traumatic stress disorder, then to make money. He soon became his supplier's supplier, sourcing methamphetamine from Atlanta, Georgia, and reselling it to his supplier-turned-customer, among others, for distribution in Chattanooga, Tennessee. By the time law enforcement caught him, Lockridge had sold over seven kilograms of methamphetamine in the Volunteer State.

In 2024, Lockridge pleaded guilty to aiding and abetting possession with the intent to distribute methamphetamine. The district court sentenced Lockridge to 210 months in prison and three years of supervised release.

Two conditions of Lockridge's supervised release require treatment for his mental-health and substance-abuse challenges. The first is a special condition that requires him to "participate in a program of mental health treatment, as directed by the probation officer, until such time as [he] is released from the program by the probation officer." R.95 at 5. The second is a special condition that requires Lockridge to "participate in a program of testing and/or treatment for drug and/or alcohol abuse, as directed by the probation officer, until such time as [he] is released from the program by the probation officer." R.95 at 5.

At sentencing, Lockridge objected that the district court must "preauthorize any inpatient treatment," as opposed to outpatient treatment, under both conditions and "set a frequency for drug testing" under the second condition. R.104 at 6. The district court, Lockridge maintained, may not constitutionally delegate these decisions to the probation officer. The court overruled Lockridge's objection. Lockridge appeals, contesting these features of his sentence.

II.

Article III of the U.S. Constitution vests the judicial power in the federal courts, including the "[i]ndisputably" judicial power "to impose the punishment provided by law." *Ex parte United States*, 242 U.S. 27, 41–42 (1916). The courts may not delegate the judicial power to the executive or legislative branches. *See United States v. Nixon*, 418 U.S. 683, 704 (1974).

Article III requires courts, consistent with congressional criminal statutes, to exercise any discretion in the imposition of a punishment. But it does not require courts alone to propose the initial conditions of a sentence. The district court may use the assistance of nonjudicial officers, as it does for other exercises of the judicial power, such as calculating damages, *Thornton v. Carson*, 11 U.S. (7 Cranch) 596, 600 (1813) (referee), analyzing common-law claims tied up in bankruptcy, *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 38 (2014) (bankruptcy judge), or proposing a report and recommendation for the disposition of a motion for summary judgment, *Beard v. Banks*, 548 U.S. 521, 528 (2006) (magistrate). What makes this assistance permissible is that the Article III court remains in charge. It reviews, then accepts, modifies, or rejects, the nonjudicial officers' recommendations. *See Kansas v. Nebraska*, 574 U.S. 445, 453 (2015).

This type of collaboration between Article III courts and non–Article III officers is common in criminal sentencing. District courts regularly look to probation officers, who lack an Article III commission, to report on each defendant's background, to propose a Guidelines sentencing range, and to make other recommendations about the conditions of a sentence. While the probation officers' proposals benefit the court, they do not bind it. The judicial power to impose the punishment remains with, and remains a final decision by, the court. *See generally United States v. Yopp*, 453 F.3d 770, 772, 774 (6th Cir. 2006).

So it is with supervised release. District courts may work with probation officers to "craft[] and manage[]" the conditions of each defendant's release, just as they do for other aspects of sentencing. *United States v. Amin*, 85 F.4th 727, 734 (4th Cir. 2023). But they must retain the "ultimate authority" to modify or enforce those conditions, just as they do for other exercises of the judicial power. *United States v. Campbell*, 122 F.4th 624, 634–35 (6th Cir.

2024) (quotation omitted); *United States v. Vaughn*, 119 F.4th 1084, 1087–88 (6th Cir. 2024); *see also Weinberger v. United States*, 268 F.3d 346, 360 (6th Cir. 2001).

As is often the case with in-the-future conditions of supervised release, the district court in this instance did not spell out precisely how these conditions would be implemented years in the future. We construe that silence not as a sign of constitutional infirmity, but as a sign that the court, the parties, and the probation officer will work through the appropriate condition at the time it becomes relevant. *See United States v. Shultz*, 733 F.3d 616, 624 (6th Cir. 2013). Put another way, when we could read an open-textured condition to violate Article III by placing ultimate authority in the probation officer, or to respect Article III by retaining that authority for the court, we adopt the reading that avoids, not exacerbates, a potential constitutional problem. *See id.*; *United States v. Ossa-Gallegos*, 491 F.3d 537, 543 (6th Cir. 2007) (en banc); *see also United States v. Mike*, 632 F.3d 686, 696 (10th Cir. 2011).

These principles frame our fresh review of Lockridge's two challenges to the conditions of his supervised release. *See United States v. Carpenter*, 702 F.3d 882, 884 (6th Cir. 2012).

*Inpatient treatment.* Lockridge first claims that the district court needed to choose between inpatient and outpatient programs for his mental-health and substance-abuse treatment at his sentencing. It did not.

The parties agree that the district court could decide at sentencing whether Lockridge must undergo treatment—here mental-health and substance-abuse treatment—during his term of supervised release. And the parties agree that the district court permissibly exercised its discretion in saying some treatment was in order. What separates the parties is whether the district court was required to specify the features of the treatment programs 210 months in advance. By not finally deciding whether inpatient or outpatient treatment was required at Lockridge's sentencing, in other words, did the district court abdicate its authority to make that decision?

We have no reason to think that the district court relinquished its authority to select Lockridge's treatment programs to the probation officer by not making that choice at sentencing, and every reason to think that the court merely delayed making that choice. Almost two decades

will pass before Lockridge begins supervised release, during which time he will attend 500 hours of substance-abuse treatment in prison and undergo any number of personal changes that a lengthy prison sentence will bring. No one, not the district court, not the probation officer, not even Lockridge himself, can predict at this stage whether Lockridge will require inpatient treatment when he begins supervised release. That renders inpatient treatment at most a possibility, not a reality. And that explains why the district court did not choose, indeed could not and should not have chosen, between inpatient and outpatient programs when it sentenced Lockridge last August. *Cf. Shultz*, 733 F.3d at 623 (declining to consider the propriety of a condition because the condition might not apply by the time the defendant's supervised release begins); *United States v. Lee*, 502 F.3d 447, 450 (6th Cir. 2007) (same); *United States v. Lantz*, 443 F. App'x 135, 139 (6th Cir. 2011) (considering the propriety of a condition because that condition will certainly apply when the defendant's supervised release begins); *see also, e.g.*, *United States v. Balon*, 384 F.3d 38, 46 (2d Cir. 2004); *United States v. Rhodes*, 552 F.3d 624, 628–29 (7th Cir. 2009); *United States v. Thomas*, 198 F.3d 1063, 1065 (8th Cir. 1999); *United States v. Bennett*, 823 F.3d 1316, 1326–27 (10th Cir. 2016).

On this record, it thus makes sense to read the sentence as reserving for the district court discretion to choose treatment programs at a time closer to Lockridge's supervised release. At that point, years into the future, Lockridge's probation officer can assess his treatment needs and recommend inpatient or outpatient treatment to the district court, with enough time for Lockridge to object, with the help of appointed counsel, before he sets foot in any program. *See* 18 U.S.C. § 3583(e)(2); Fed. R. Crim. P. 32.1(c)(1); *see also, e.g.*, *Shultz*, 733 F.3d at 623; *Balon*, 384 F.3d at 47; *Rhodes*, 552 F.3d at 629; *Thomas*, 198 F.3d at 1065; *Bennett*, 823 F.3d at 1327. Then and only then will the district court weigh Lockridge's need for inpatient treatment, if such a need exists, against Lockridge's liberty interests before those interests are compromised. *See* 18 U.S.C. § 3583(d)(2). The court, not the probation officer, thus will decide whether Lockridge must be involuntarily committed or must attend inpatient treatment against his wishes. *See id.* § 4246; Tenn. Code Ann. § 33-3-617. All of this ensures that decisions regarding Lockridge's treatment rest where Article III requires: with the district court.

Resisting this conclusion, Lockridge points to several circuits that purportedly require district courts to specify whether treatment will be inpatient or outpatient. *United States v. Matta*, 777 F.3d 116, 122–23 (2d Cir. 2015); *United States v. Martinez*, 987 F.3d 432, 435–36 (5th Cir. 2021); *United States v. Esparza*, 552 F.3d 1088, 1091 (9th Cir. 2009) (per curiam); *Mike*, 632 F.3d at 695–96. But none of those cases conflicts with our disposition of this one. Either the circuit court addressed such a short prison sentence that the district court could have and should have made the treatment decision at the defendant's sentencing. *See Martinez*, 987 F.3d at 436 (ten months). Or the circuit court was not presented with the argument that it could construe the condition to give the district court the final say over the defendant's treatment program. *See Matta*, 777 F.3d at 122–23; *Esparza*, 552 U.S. at 1091; *cf. Mike*, 632 F.3d at 695–96 (construing the condition as permitting the court to make the decision in the future and finding it permissible).

*Frequency of drug testing.* Lockridge's second challenge fares no better: that the district court needed to specify the number of drug tests required by his substance-abuse special condition.

The problem for Lockridge is that we have already held that district courts may collaborate with probation officers on this feature of a sentence. The district court may allow the probation officer to take the first pass at the number of drug tests required by a special condition, so long as the court remains free to modify that choice on its own initiative or in response to a claim by the defendant. *Vaughn*, 119 F.4th at 1088–89; 18 U.S.C. § 3583(e)(2); *see also Carpenter*, 702 F.3d at 884–85. That is all that happened here.

We affirm.